**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diamond Warren, et al., | No. CV-22-02200-PHX-DWL (CDB) |
| Plaintiffs, | |
| v. | **ORDER** |
| Paul Penzone, et al., | |
| Defendants. | |

## INTRODUCTION

In this civil rights action, Plaintiffs Diamond Warren and Robert Yates, the surviving parents of Akeem Terrell ("Akeem"), allege that five Phoenix Police Department ("PPD") officers and three members of the Maricopa County Sheriff's Office ("MCSO") (collectively, "the Defendant Officers") used excessive force on Akeem and ignored Akeem's serious medical needs, resulting in Akeem's unnecessary pain, suffering, and death. (Doc. 80.)

In Counts One through Four of the Second Amended Complaint ("SAC"), Plaintiffs assert § 1983 claims against the Defendant Officers premised on the violation of various rights guaranteed by the Fourth and Fourteenth Amendments. (*Id.* ¶¶ 177-203.) In Count Five, Plaintiffs assert a *Monell* claim against the City of Phoenix. (*Id.* ¶¶ 204-09.) In Count Six, Plaintiffs assert a *Monell* claim against Maricopa County Sheriff Paul Penzone and Maricopa County. (*Id.* ¶¶ 210-15.) In Count Seven, Plaintiffs assert a state-law claim for wrongful death against all Defendants. (*Id.* ¶¶ 216-29.)

1    Now pending before the Court is a Rule 12(b)(6) motion to dismiss filed by Sheriff

2    Penzone and Maricopa County (together, "Movants").  (Doc. 92.)  The motion is fully

3    briefed.  (Docs. 112, 121.)  For the following reasons, the motion is granted in part and

4    denied in part.[1]

5    **DISCUSSION**

6    I.   <u>Legal Standard</u>

7    "[T]o survive a motion to dismiss [under Rule 12(b)(6)], a party must allege

8    'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

9    face.'"  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting

10   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the

11   plaintiff pleads factual content that allows the court to draw the reasonable inference that

12   the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

13   "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and

14   are construed in the light most favorable to the non-moving party." *Id.* at 1444−45 (citation

15   omitted).  However, the Court need not accept legal conclusions couched as factual

16   allegations. *Iqbal*, 556 U.S. at 679-680.  Moreover, "[t]hreadbare recitals of the elements

17   of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679.

18   The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc.*,

19   795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

20   II.  <u>Relevant Factual Allegations</u>

21   The only claims at issue here are Plaintiffs' claims against Movants in Count Six

22   (*Monell*) and Count Seven (state-law wrongful death).  Those claims are based on the

23   following allegations:

24   A.   **Akeem's Arrest And Death In MCSO Custody**

25   Akeem was an African-American man with a history of mental illness.  (Doc. 80

26   ¶¶ 33-34.)  While at a party on January 1, 2021, Akeem began behaving bizarrely,

27

28   _____

[1]   Plaintiffs' request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process.  *See* LRCiv 7.2(f).

expressing paranoid thoughts and not making sense.  (*Id.* ¶¶ 35-36.)  PPD officers arrived and began talking to Akeem, who was clearly mentally ill or mentally disturbed, and when Akeem refused their requests to leave the party, the officers arrested and handcuffed him. (*Id.* ¶¶ 38-42.)

Akeem was approximately 6'2″ and 433 pounds, and because of his large size, the PPD officers used two sets of handcuffs linked together to handcuff him behind his back. (*Id.* ¶ 43.)  Akeem, who was unarmed, engaged only in passive resistance by becoming "dead weight" or "going limp."  (*Id.* ¶¶ 41-45.)  The PPD officers arrested Akeem for trespassing and resisting arrest and transported him to the Maricopa County Jail ("the Jail").  (*Id.* ¶¶ 46-48.)  The PPD officers notified jail staff ahead of time that they were bringing in a "combative prisoner," but they did not say Akeem was mentally ill.  (*Id.* ¶¶ 49-50.)

Upon arrival at the Jail, Akeem continued to act in ways that showed he was clearly mentally ill.  (*Id.* ¶ 51.)  When MCSO deputies pulled him out of the PPD police vehicle and carried him into the Jail, Akeem repeatedly expressed confusion about his location, believing he was in Tucson or Pinal County, and repeatedly yelled, "They're trying to kill me, they're trying to kill me," and "This is just a game.  This is just a show."  (*Id.* ¶¶ 53-56.)  The officers noticed that Akeem was "out of it" and had difficulty standing on his own and keeping his equilibrium, and they deposited him on a padded surface near the intake search area and searched him on the ground.  (*Id.* ¶¶ 58-60.)  The officers then lifted Akeem up and pulled up his pants, which had fallen down when the officers dragged him into the Jail.  (*Id.* ¶¶ 59, 61.)

After searching Akeem, MCSO deputies Sergeant Isaac Perez ("MCSO Perez") and Detention Officer Airrion Moses ("MSCO Moses") grabbed and held Akeem by the arms and shoulders and forcefully pushed him through the search area, down a hallway, and into a pre-isolation cell, while PPD officers Danny Rubio ("PPD Rubio") and James Jessen ("PPD Jessen") followed.  (*Id.* ¶¶ 62-63.)[2]  Akeem was never "booked into" or admitted to

---

[2]      Plaintiffs' allegations of what occurred in the hallway and the pre-isolation cell are

the Jail.  (*Id.* ¶ 129.)  While pushing Akeem toward the pre-isolation cell, MSCO Perez and MSCO Moses pulled up on Akeem's handcuffs.  (*Id.* ¶ 63.)  They did not give Akeem any commands or explain where they were taking him or why, and they did not tell him what to do when they got to the cell.  (*Id.* ¶¶ 65-66.)

When MSCO Perez and MSCO Moses entered the pre-isolation cell with Akeem, they quickly pushed Akeem to the wall without warning or explanation, and they and PPD Rubio pulled on Akeem's ankles and swept his legs out from under him, causing Akeem to fall into the cell wall and then onto the hard, concrete floor.  (*Id.* ¶¶ 67-69.)  Because Akeem's hands were cuffed behind his back, his face and head initially broke his fall on the hard concrete.  (*Id.* ¶ 69.)  When Akeem's body struck the ground, he landed on his side, but MSCO Perez, MSCO Moses, PPD Rubio, and PPD Jessen forced Akeem onto his stomach while PPD Officers Alexander Kubes ("PPD Kubes") and Gustavo Corrales ("PPD Corrales") stood by and watched.  (*Id.* ¶ 71.)

While Akeem was on his stomach, the officers swapped out the PPD handcuffs for MCSO handcuffs by first applying the MCSO handcuffs behind Akeem's back, so Akeem was then restrained in two sets of handcuffs, and then removed the substantially identical PPD handcuffs.  (*Id.* ¶¶ 73-74.)  PPD Rubio and PPD Jessen crossed Akeem's feet at his ankles and bent Akeem's legs backward at the knee so that Akeem's heels were facing his buttocks, and PPD Rubio placed his own bodyweight on Akeem's bent legs, placing Akeem in a "hogtied" position known to compromise a person's ability to breath, especially in heavyset, obese, or barrel-chested people, which can create a risk of serious injury or death due to positional asphyxia.  (*Id.* ¶¶ 72, 77-78.)

While PPD Rubio applied his bodyweight to Akeem's bent legs, MCSO Moses bent Akeem's handcuffed left hand backward and pulled it toward Akeem's head, and MCSO Perez placed his knee on Akeem's lower back or right buttock to hold Akeem prone, further impeding Akeem's ability to breathe.  (*Id.* ¶¶ 79-80.)  At the same time, PPD Jessen had his knee on the left side of Akeem's body and was also applying his bodyweight to keep

_____

based, in part, on video evidence and reproductions of still shots.  (*See, e.g.*, Doc. 80 at 8.)

Akeem in a prone position.  (*Id.* ¶ 81.)  The officers forced Akeem's head against the wall while bending and putting pressure on Akeem's neck, making it even more difficult for Akeem to breathe.  (*Id.* ¶ 82.)  MSCO Detention Officer Nathan Bulldis ("MCSO Bulldis") and additional PPD officers watched and did not intervene, even though MCSO Bulldis later said he knew Akeem was in or close to being in a medical emergency.  (*Id.* ¶¶ 85-86.)

By 3:04 a.m., MCSO Perez, MSCO Moses, and the PPD officers had been forcing Akeem prone against the floor with his feet forced backward towards his buttocks for one minute and 40 seconds.  (*Id.* ¶ 87.)  While being held down, Akeem moved in a manner PPD Rubio described as "bucking," and PPD Rubio briefly moved off Akeem's legs.  (*Id.* ¶ 88.)  Up to this time, Akeem had been speaking almost constantly in a "repeating loop" in a manner clearly indicative of mental illness, making references to "Facebook" and "Facebook Live," naming unknown individuals, expressing confusion about where he was, and repeatedly saying, "they're trying to kill me."  (*Id.* ¶ 89.)  While moving on the ground, Akeem said what sounded like "stay off, stay off of me" and "they're trying to kill me."  (*Id.* ¶ 90.)

In response to Akeem's movements, PPD Corrales and PPD Kubes joined the other officers in holding Akeem down on the floor so that, in addition to MCSO Perez and MCSO Moses, who were pressed up against the wall, near Akeem's head, all five PPD officers pushed against or kneeled into Akeem's back and lower body.  (*Id.* ¶¶ 91-92.)  During this time, Akeem was grunting and moaning in pain with his head pressed up against the wall.  (*Id.* ¶¶ 93-95.)  Akeem's final words before he stopped moving and talking were "killing me, killing me."  (*Id.* ¶ 96.)  After this, Akeem stopped moving, and the only sound he made was shallow, labored breathing, but even then, the officers continued to hold him down in the "hogtied" position.  (*Id.* ¶¶ 97-98.)

At 3:06 a.m., after Akeem became completely motionless, the officers backed out of the cell and left Akeem lying face down while handcuffed tightly behind his back with his head pressed against the wall and his neck bent at an unnatural angle.  (*Id.* ¶¶ 106-07, 110.)  The officers did not move Akeem into a recovery position, and for the next six

minutes, they did not summon medical help or check Akeem's pulse.  (*Id.* ¶¶ 110-15.)  Akeem was handcuffed and face down on the floor of the pre-isolation cell for a total of more than nine minutes.  (*Id.* ¶¶ 115-17.)  For the first three minutes, the officers were applying their body weight to his back and forcing his feet backward toward his buttocks, and for the last six minutes, Akeem was alone and unmoving.  (*Id.*)

At about 3:11:55, after an officer noticed Akeem was not moving, MCSO Moses and two other MCSO officers reentered the pre-isolation cell.  (*Id.* ¶ 118.)  Akeem remained face down and motionless with his neck forced against the wall when PPD Officer McKim ("PPD McKim") joined the MCSO officers.  (*Id.* ¶ 119.)  After PPD McKim entered, the officers pulled Akeem by his legs away from the wall, and at 3:12:39, they moved Akeem onto his side.  (*Id.* ¶ 121.)  MCSO Moses then determined that Akeem had no pulse and summoned medical care.  (*Id.* ¶ 122.)  At 3:13:17 a.m., officers returned Akeem to a face-down position to remove his handcuffs then rolled him onto his back and handcuffed him in front of his body even though he had no pulse and had not moved for several minutes.  (*Id.* ¶ 124.)  Only after they finished handcuffing Akeem's hands in front of his body did the officers begin performing CPR and other lifesaving measures.  (*Id.* ¶ 125.)

At approximately 3:41:17 a.m., Phoenix Fire Department personnel removed Akeem from the pre-isolation cell on a gurney and transported him to Banner University Medical Center, where he was pronounced dead that same day.  (*Id.* ¶¶ 126-27.)

B.     **Movants' Policies and Practices**

In a section of the SAC entitled "Maricopa County and Sheriff Penzone's Unconstitutional Policies, Customs, Procedures, and Training; and Ratification of Akeem Terrell's Death" (Doc. 80 ¶¶ 131-156), Plaintiffs offer a number of allegations intended to support their *Monell* and other claims against Movants.[3]

---

[3]     In addition to the categories of specific allegations summarized below, Plaintiffs broadly allege that Movants are responsible for training and supervising MCSO officers in the proper use of force (*id.* ¶¶ 131-32) and that MCSO officers daily interact with and use force against arrestees who are not admitted to the Jail (*id.* ¶ 135).

First, Plaintiff offer several allegations regarding the use of submission techniques. More specifically, Plaintiffs allege that Movants have a policy, practice, or custom of allowing MCSO officers to use certain submission techniques, including prone positioning, which pose a significant risk of positional asphyxiation and death and increase the incidence of uses of unreasonable force. (*Id.* ¶¶ 133-34.) Plaintiffs also allege that Movants have failed to properly train or supervise their employees on the dangers and danger signs of positional asphyxia, which are obvious and have been known to the County since the 1990s. (*Id.* ¶¶ 140-41.)

Second, Plaintiff offer several allegations regarding interaction with mentally or emotionally disturbed citizens. More specifically, Plaintiffs allege that Movants are responsible for training and supervising MCSO officers on interacting with mentally or emotionally disturbed citizens and have failed to properly train or supervise MCSO officers regarding interacting with these individuals or on appropriate uses of force against them. (*Id.* ¶¶ 137-38.) Plaintiffs also allege that Movants have a widespread custom and practice of designating mentally ill arrestees who are behaving bizarrely as "combative," which ignores their serious medical needs and results in "the widespread use of unnecessary force against such individuals." (*Id.* ¶ 142-43.) Plaintiffs allege that these failures have resulted in prior constitutional violations, including the death of Ernest "Marty" Atencio. (*Id.* ¶ 139.)

Third, Plaintiff offer several allegations regarding the use of pre-isolation cells. More specifically, Plaintiffs allege that Movants have a widespread custom and practice of confining mentally ill arrestees who have not been admitted to the Jail in pre-isolation cells, where they are in the care, custody, and control of Movants. (*Id.* ¶¶ 144-47.) Plaintiffs further allege that Movants train their employees that people, including mentally ill people, confined in pre-isolation cells are not in their care, custody, and control, such that they have no duty to monitor, protect, or care for such individuals. (*Id.* ¶¶ 148-50.) Plaintiffs further allege that Movants have failed to create policies governing the use of force and

provision of medical and mental healthcare for individuals placed in pre-isolation cells. (*Id.* ¶¶ 136, 151.)

Fourth, Plaintiffs offer allegations regarding <u>the provision of medical care</u>.  More specifically, Plaintiffs allege that Movants' failure to train and supervise MCSO employees in providing and monitoring medical care for detainees with obvious medical needs is widespread and has resulted in past incidents of medical neglect of those in MCSO custody. (*Id.* ¶ 152.)  Plaintiffs then identify two such examples: (1) on November 1, 2016, Brett Figgins died in the Jail after detention officers repeatedly ignored signs of his physical decline and failed to contact medical personnel to respond to his medical needs; and (2) on May 26, 2020, detainee Brian Ortiz was beaten unconscious by another detainee and suffered from seizures and bleeding from his head for two hours before MCSO personnel summoned medical care.  (*Id.*)

Fifth, Plaintiffs offer allegations regarding <u>internal investigations of death-in-custody incidents</u>.  More specifically, Plaintiffs allege that County policy requires that a professional standards investigation be conducted after the death of a person in custody to determine if MCSO officers violated any County policies, but more than two years after Akeem's death, Movants had not completed internal affairs or professional standards investigations into Akeem's death and had not disciplined, terminated, or retrained any of the MCSO officers responsible for his death.  (*Id.* ¶¶ 153-55.)  According to Plaintiffs, this "indicates that the Officers' actions were standard operating procedure, and amount to the official policy of Maricopa County."  (*Id.* ¶ 156.)

III.   Count Six: *Monell* Claim

A.   **Legal Standard**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  A "person" includes local government entities.  *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 690 (1978).  However, "a local

government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  *See also Leatherman v. Tarrant Cnty. Narcotics Intel. and Coordination Unit*, 507 U.S. 163, 166 (1993) ("[A] municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury."); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("A municipality may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents."). Thus, "to establish liability for governmental entities under *Monell*, a plaintiff must prove (1) that the plaintiff possessed a constitutional right of which []he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).  "[L]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Municipal liability may also arise when a local government entity fails to adequately train or supervise its employees.  *See, e.g., Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."); *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (analyzing failure-to-train *Monell* claim); *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006) ("A failure to train or supervise can amount to a policy or custom sufficient to impose [§ 1983] liability.") (citation omitted).  Mere negligence in training or supervision, however, cannot not give rise to a *Monell* claim. *Davis v. City of Ellensburg,* 869 F.2d 1230, 1235 (9th Cir. 1989).  A plaintiff pursuing *Monell* liability

based on a failure to train or supervise must allege that the municipality exhibited "'deliberate indifference to the rights of persons' with whom those employees are likely to come into contact." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (citation omitted). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). It may be shown if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cnty. Comm'rs*, 520 U.S. at 409). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

Finally, although *Monell* claims may have been subject to a lesser pleading standard before *Iqbal* and *Twombly* were decided, it is now well established in the Ninth Circuit that a plaintiff seeking to assert such a claim must allege *facts* that would support the existence of the alleged policy, practice, or custom. *See, e.g., A.E. ex rel. Hernandez v. City of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) ("[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. This standard applies to *Monell* claims . . . .") (citations omitted); *Dougherty*, 654 F.3d at 900-01 ("Dougherty's *Monell* and supervisory liability claims lack any factual allegations that would separate them from the 'formulaic recitation of a cause of action's

elements' deemed insufficient by *Twombly*. . . .   The Complaint lacked any factual allegations regarding key elements of the *Monell* claims, or, more specifically, any facts demonstrating that his constitutional deprivation was the result of a custom or practice of the City of Covina or that the custom or practice was the 'moving force' behind his constitutional deprivation."). *See also Hyer v. City & Cnty. of Honolulu*, 2020 WL 7038953, *6 (D. Hawaii 2020) ("Prior to 2009, the Ninth Circuit . . . regularly held that a claim of municipal liability under Section 1983 was sufficient to withstand a motion to dismiss based on nothing more than bare allegations of an unconstitutional policy, practice, or custom.  The low pleading threshold was rejected by the United States Supreme Court in [*Iqbal*].  Since *Iqbal*, courts in the Ninth Circuit have repeatedly rejected *Monell* claims based on conclusory allegations that lack factual content from which one could plausibly infer municipal liability.") (citations omitted); *Brown v. City of Mariposa*, 2019 WL 4956142, *4 (E.D. Cal. 2019) ("In order to withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of more than mere formulaic recitations of the existence of an unlawful policy. . . .  [W]hile the Court recognizes the inherent difficulty of identifying specific policies absent access to discovery, that is nonetheless the burden of plaintiffs in federal court.") (citations and internal quotation marks omitted).

### B.   **The Parties' Arguments**

Movants do not dispute that Plaintiffs' allegations are sufficient to state excessive-force, failure-to-protect, and deliberate-indifference claims against the MCSO officers involved in Akeem's takedown and death.  The Court must therefore determine whether Plaintiffs have alleged sufficient facts to show that (1) Movants had a policy, custom, or practice that amounts to deliberate indifference to the constitutional rights of citizens with whom MCSO officers come into contact; and (2) this policy, custom, or practice was the "moving force" behind Akeem's injuries and death.

Broadly speaking, Movants argue that Plaintiffs have not alleged sufficient facts to make these showings because their failure-to-train and failure-to-supervise allegations "are all conclusions" lacking any factual support.  (Doc. 92 at 4.)  Movants also argue that the

Court should dismiss Sheriff Penzone from Count Six because a policy or custom claim against Sheriff Penzone in his official capacity is no different than a claim against the County, making the *Monell* claim against Sheriff Penzone duplicative.  (*Id.* at 18.)

Plaintiffs argue that their allegations about Movants' deliberately indifferent policies, customs, and training are sufficient to state a *Monell* claim because they include specific facts that can be proved or disproved and that are set forth in "short and plain statements," as required by Rule 8.  (Doc. 112 at 6.)  Plaintiffs do not respond to Movants' argument that, even if they have stated a *Monell* claim, this claim should be dismissed against Sheriff Penzone because it is duplicative of their claim against the County.

C.    **Discussion**

Plaintiffs' allegations of deliberately indifferent policies, customs, and supervisory and training failures can be construed as falling into five categories: (1) prone positioning and positional asphyxia (Doc. 80 ¶¶ 133-34, 140-41); (2) interaction with mentally or emotionally disturbed citizens (*id.* ¶¶ 137-39, 142-43); (3) use of pre-isolation cells (*id.* ¶¶ 136, 144-51); (4) provision of medical care (*id.* ¶ 152); and (5) internal investigations of death-in-custody incidents (*id.* ¶¶ 153-56).

1.    Prone Positioning And Positional Asphyxia

Plaintiffs allege that "[p]lacing handcuffed people in a prone position creates an immediate risk of death or serious bodily injury," due to positional asphyxia, and that this risk "is especially true for heavyset, obese, or barrel-chested people."  (Doc. 80 ¶ 72.) Plaintiffs also allege that Movants allowed their officers to use prone positioning on detainees but "failed to properly train and supervise their deputies regarding the dangers of positional asphyxia and the danger signs of positional asphyxia."  (*Id.* ¶¶ 134, 140.)

These allegations satisfy the threshold requirement for a *Monell* claim because they identify "specific shortcomings" in the County's use-of-force training.  *Bini v. City of Vancouver*, 218 F. Supp. 3d 1196, 1203 (W.D. Wash. 2016) ("Absent allegations of specific shortcomings in the training of City police officers or facts that might place the City on notice that constitutional deprivations were likely occur, Plaintiff has not

1    adequately pled a § 1983 claim against the City for failure to train.").  As such, they provide

2    "fair notice" to Movants of the basis for the *Monell* claim predicated on this alleged failure

3    to train/supervise.  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); Fed. R. Civ. P. 8(a)(2).

4        But even accepting that Movants failed to provide proper training on positional

5    asphyxia, Plaintiffs must also allege facts showing that "the need for more or different

6    training" in this area was "so obvious, and the inadequacy so likely to result in the violation

7    of constitutional rights," that Movants "can reasonably be said to have been deliberately

8    indifferent to the need."  *City of Canton*, 489 U.S. at 390.  In an effort to meet that burden,

9    Plaintiffs allege that "the dangers of positional asphyxia are obvious and have been known

10   to Maricopa County since the 1990s."  (Doc. 80 ¶ 141.)  This allegation is too conclusory

11   to demonstrate deliberate indifference.  Notably, Plaintiffs fail to allege any *facts* to support

12   the conclusion that Maricopa County has been aware of the obvious risks of positional

13   asphyxia since the 1990s.  *Iqbal*, 556 U.S. at 679 ("Threadbare recitals of the elements of

14   a cause of action, supported by mere conclusory statements, do not suffice.").

15       In a related vein, the SAC only identifies three prior incidents that purportedly

16   provided notice of the deficiency of Movants' training and policies.  (Doc. 80 ¶¶ 139

17   [Atencio], 152 [Figgins, Ortiz].)  However, the SAC does not allege that any of those

18   incidents involved positional asphyxia.  (*Id.*)  Nor do Plaintiffs otherwise argue or present

19   evidence that any of those incidents involved positional asphyxia.  (Doc. 112 at 7 [only

20   proffered details regarding the Atencio incident are that "it involved the use of force against

21   a mentally ill man" and resulted in a large settlement]; *id.* at 8 [only proffered details

22   regarding the Figgins incident are that it resulted in "death . . . after detention officers

23   ignored [Figgins's] medical needs" and resulted in a large settlement]; *id.* [only proffered

24   details regarding the Ortiz incident are that "Ortiz's serious medical needs were ignored"

25   and the incident resulted in a large settlement].)  As noted, "[a] pattern of similar

26   constitutional violations by untrained employees is 'ordinarily necessary' to make" the

27   required showing of deliberate indifference in relation to an alleged training failure.

28   *Connick*, 563 U.S. at 62.  "Without notice that a course of training is deficient in a particular

1   respect, decisionmakers can hardly be said to have deliberately chosen a training program

2   that will cause violations of constitutional rights." *Id.* Thus, Plaintiffs have failed to state

3   a *Monell* claim based on Movants' alleged failure to provide training concerning the

4   dangers of positional asphyxia.

5             2.      Interaction With Mentally Or Emotionally Disturbed Citizens

6             Plaintiffs' second set of allegations (Doc. 80 ¶¶ 137-39, 142-43) are also insufficient

7   to support *Monell* liability. As an initial matter, although Plaintiffs broadly criticize the

8   entirety of Movants' policies and training "regarding interaction with, and the use of force

9   against, the mentally ill or emotionally disturbed citizens" (*id.* ¶ 138), this is not the sort of

10  "specific shortcoming" that could give rise to a *Monell* claim. *Bini*, 218 F. Supp. 3d at

11  1203.

12            To that end, the only specific shortcoming regarding mentally or emotionally

13  disturbed citizens that is identified in other portions of the SAC is Movants' alleged

14  "widespread custom and practice of designating mentally ill arrestees who are acting

15  bizarrely as 'combative.'" (*Id.* ¶ 142.) However, as with Plaintiffs' allegations regarding

16  positional asphyxia, the problem is that there are no *facts* alleged in the SAC that might

17  support this conclusion. Again, the SAC identifies only three prior incidents involving

18  other arrestees and does not allege (and Plaintiffs do not otherwise argue or present

19  evidence) that any of those incidents involved MCSO personnel improperly characterizing

20  as "combative" an arrestee who was simply mentally ill. Indeed, the only prior incident

21  identified in the SAC as involving a mentally ill detainee is "the death of Ernest 'Marty'

22  Atencio.'" (*Id.* ¶ 139.)[4] But as noted, Plaintiffs provide no details regarding that incident.[5]

23  _____

[4] To the extent paragraph 139—"Maricopa County's failure to train its employees
24  regarding the mentally ill and use of force has resulted in prior constitutional violations,
    most famously the death of Ernest 'Marty' Atencio"—is intended to plead the existence of
25  additional prior violations involving mentally-ill detainees beyond the incident involving
    Mr. Atencio, it is insufficient for that purpose. A vague allusion to unspecified other cases
26  is not the sort of factual allegation that might suffice under *Iqbal/Twombly* and *Hernandez*.

    [5] The Court also notes that Plaintiffs concede that the MCSO officials at the Jail were
27  told by the arresting PPD officers, before Akeem even arrived at the Jail, that Akeem was
    "combative." (Doc. 80 ¶ 49.) Given this concession, it is unclear how any general MCSO
28  policy of treating mentally ill detainees as "combative" could have been the moving force
    behind the alleged constitutional violation here.

It follows that the Atencio incident and the other two incidents referenced in the SAC could not have provided the required notice to Movants of the deficiency of their policies or training program related to mentally ill or emotionally disturbed citizens. *Connick*, 563 U.S. at 62.

### 3. Use Of Pre-Isolation Cells

Plaintiffs' third set of allegations (Doc. 80 ¶¶ 136, 144-51) are insufficient for similar reasons. Even accepting that MCSO officers are improperly trained to believe the "fiction" that individuals confined in the MCSO's pre-isolation cells are not in the County's "care, custody, or control" (*id.*), Plaintiffs have not alleged any other instances of constitutional violations that occurred in pre-isolation cells or any other facts from which to infer a "widespread custom or practice" of MCSO officers violating the constitutional rights of individuals placed in such cells. There is no allegation that any of the three prior incidents referenced in the SAC involved pre-isolation cells. (*Id.* ¶¶ 139, 152.)

### 4. Provision Of Medical Care

Plaintiffs' fourth set of allegations are also insufficient to support a *Monell* claim. Although Plaintiffs allege that Movants "have a long history of failing to train and supervise their employees with regard to monitoring detainees for medical needs and providing medical care for detainees with obvious medical needs" that is "widespread" and "amounts to an unofficial policy and has resulted in multiple past incidents" (Doc. 80 ¶ 152), these are just the sort of fact-free conclusions that the Ninth Circuit has deemed insufficient to support a *Monell* claim. *See, e.g., Dougherty*, 654 F.3d at 900-01 ("Dougherty's *Monell* and supervisory liability claims lack any factual allegations that would separate them from the 'formulaic recitation of a cause of action's elements' deemed insufficient by *Twombly*. . . . The Complaint lacked any factual allegations regarding key elements of the *Monell* claims, or, more specifically, any facts demonstrating that his constitutional deprivation was the result of a custom or practice of the City of Covina or that the custom or practice was the 'moving force' behind his constitutional deprivation.").

Simply *saying* that a municipality has a "long history" of constitutional violations is not enough—the plaintiff must plead *facts* supporting that claim.

To that end, the only two incidents identified in the SAC as involving the failure to provide medical care are the Figgins incident in 2016, which is alleged to have involved a detainee who "died in the Maricopa County Jail after detention officers ignored repeated signs of his physical decline and failed to contact medical personnel to respond to his obvious needs," and the Ortiz incident in 2020, where "a fellow inmate beat [Ortiz] unconscious in a Maricopa County Jail facility" and "Maricopa County personnel ignored [Ortiz's] serious medical needs for approximately two hours before finally summoning medical care."  (Doc. 80 ¶ 152.)

Although the sufficiency of these allegations presents a somewhat closer call than the sufficiency of the allegations supporting Plaintiffs' other *Monell* theories, the Court agrees with Movants that the allegations remain deficient.  Although the SAC offers only a handful of details regarding the Figgins and Ortiz incidents, Movants present an array of additional details in their motion.  Because those details are derived from the pleadings in the *Figgins* and *Ortiz* lawsuits and are not disputed by Plaintiffs (Doc. 112), the Court may consider them at the motion-to-dismiss stage.[6]

As for Figgins, "[t]he Complaint alleged improper medical care to a jail inmate who died twelve days after he was booked into the jail.  The only claims in the complaint were negligence and medical negligence—there are no constitutional claims.  There were no

---

[6]        "When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond.  A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).  Here, Movants' proffered details from the *Figgins* and *Ortiz* lawsuits are properly before the Court for two different reasons under *Ritchie*: first, because paragraph 152 of the SAC specifically refers to those lawsuits and resulting settlements and thus incorporates the underlying details by reference; and second, because complaints filed in a different lawsuit are subject to judicial notice regardless of whether they are incorporated by reference in the complaint in the current lawsuit.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.").

allegations of issues with positional asphyxia, no allegations of failure to train or supervise, no allegations of issues with the responsibility for arrestees between the Sheriff and the arresting agency, no issues involving 'isolation cells,' and no issues about medical or mental-health treatment of individuals arriving at the jail.  And unlike this case, Mr. Figgins was booked into the jail and unquestionably the responsibility of the Sheriff's Office." (Doc. 92 at 9, citations omitted).  As for Ortiz, "[t]he Complaint allege[d] that Mr. Ortiz was an inmate at the Fourth Avenue Jail and housed in Close Custody housing and assigned to cell 1.03," that "Mr. Ortiz was punched, kicked and stomped by another inmate almost 50 times," and that Mr. Ortiz "was not so much as placed in an ambulance until approximately 2 hours and 15 minutes after he was lying unconscious on the ground, seizing and bleeding from his head. . . .  [T]here were no allegations of issues with positional asphyxia, no allegations of issues with the responsibility for arrestees between the Sheriff and the arresting agency, no issues involving 'isolation cells,' and no issues about medical or mental-health treatment of individuals arriving at the jail.  And unlike this case, Mr. Ortiz was booked into the jail and unquestionably the responsibility of the Sheriff's Office. . . .  [and] there is a striking difference between the 2 hours and 15 minutes in Ortiz and the 6 minutes alleged here."  (*Id.* at 9-10, cleaned up.)

In their motion, Movants argue that "[t]hese incidents are too different from this case to form a pattern or practice or put [Movants] on notice.  Even if categorized far too generously as *Figgins* being about a similar medical issue and *Ortiz* about an abandonment issue, they still represent only an individual case about each of these issues which is insufficient to support a *Monell* claim.  Even if these cases and *Atencio* were similar enough to put these Defendants on notice of something—and they are not—three incidents over a nine-year period, each about four years apart, does not show a pattern or practice and cannot put a defendant on notice about a continuing problem."  (*Id.* at 10.)  The Court fully agrees with this analysis, which Plaintiffs make little effort to rebut in their response brief. (Doc. 112 at 8 [simply arguing that the Figgins and Ortiz incidents were "dramatic" and suggesting, without elaboration, that "[t]hey are not the only such incidents"].)  Dismissal

is warranted in this circumstance.  *See also Connick*, 563 U.S. at 62 ("A pattern of *similar* constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.") (emphasis added); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."); *Wettstein v. City of Riverside*, 2020 WL 2199005, *5 (C.D. Cal. 2020) ("While there is no per se rule for the amount of unconstitutional incidents required to establish a custom under *Monell*, one or two incidents ordinarily cannot establish a custom, while more incidents may permit the inference of a custom, taking into account their similarity, their timing, and subsequent actions by the municipality.  The Ninth Circuit and district courts within the Ninth Circuit have repeatedly declined to infer a custom of constitutional violations based on two unconstitutional incidents alone.") (cleaned up) (collecting cases); *Wondie v. King County*, 2023 WL 22058, *3 (W.D. Wash. 2023) ("Typically, one or two instances of prior misconduct cannot demonstrate a widespread custom or policy. . . .  And while prior cases of similar conduct may provide some evidence that a practice is so ubiquitous that it amounts to official policy, such cases are less helpful when they do not result in an adjudication of wrongdoing.") (citations omitted).

### 5. Internal Investigations Of Death-In-Custody Incidents

Plaintiffs' final set of allegations concern Movants' failure to complete an internal investigation into Akeem's death or to discipline the involved MCSO personnel.  (Doc. 180 ¶¶ 153-55.)  Plaintiffs allege that the absence of such actions "indicates that the Officers' actions were standard operating procedure, and amount to the official policy of Maricopa County." (*Id.* ¶ 156.)  In their response brief, Plaintiffs reiterate these allegations, cite several other cases as proof of "a long-standing pattern of failing to investigate incidents in the Jail by Maricopa County, Sheriff Penzone's predecessor, and now Sheriff Penzone," and identify *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), as a case authorizing *Monell* liability under these circumstances.  (Doc. 112 at 8-9.)  In reply,

Movants argue that "[a]n incomplete professional-standards investigation is not a basis for liability" and cite *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), for the proposition that the absence of discipline is not the same thing as ratification.  (Doc. 121 at 9.)  Movants also disclose that although the MCSO's internal investigation hadn't been completed at the time the SAC was filed, it was recently completed and resulted in a determination that no discipline should be imposed against the involved MCSO personnel.  (*Id.*)  Finally, Movants argue that although "the timeliness and staffing of investigations certainly has constitutional dimensions, it is an unreasonable and unwarranted leap of logic to equate these issues with internal investigations to ratification of the decisions and actions of these Sheriff 's deputies.  In fact, [other courts have] praised the quality of the Sheriff's Department's internal investigations."  (*Id.* at 10, citation omitted.)

The Court agrees with Movants that the allegations in the SAC related to internal investigations (or the lack thereof) do not save Count Six from dismissal.  Plaintiffs do not identify any case holding (or even suggesting) that a failure to complete a timely internal investigation into an incident provides a pathway for holding a local government entity responsible for that incident under *Monell*.  Nor would such a rule make sense, given that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." *Connick*, 563 U.S. at 63 n.7 (cleaned up).  As for the Movants' disclosure that the internal investigation has now been completed and that the involved officers will not be facing discipline, not only are these facts not pleaded in the SAC, but they would not amount to ratification for *Monell* purposes even if they were.  *Sheehan*, 743 F.3d at 1231 ("Sheehan contends that the city ratified the officers' conduct by not disciplining them.  Ratification, however, generally requires more than acquiescence.  There is no evidence in the record that policymakers made a deliberate choice to endorse the officers' actions.  The mere failure to discipline Reynolds and Holder does not amount to ratification of their allegedly unconstitutional actions.") (cleaned up).  *Larez* is not to the contrary, as there the supervisory official admitted he had instructed his subordinates to engage in the conduct

giving rise to liability.  946 F.2d at 641 ("The . . . statements [that] were attributed to Gates . . . [included] 'I tell my officers to do something—and we do something and they give them $90,000.'").  There is no remotely similar allegations here.

### 6.   Conclusion

Given these determinations, the Court agrees with Movants that Count Six must be dismissed under Rule 12(b)(6).  These determinations also make it unnecessary to resolve Movants' alternative grounds (Doc. 92 at 11-16) for seeking the dismissal of Count Six.

## IV.   Count Seven: State-Law Wrongful Death Claim

Plaintiffs' state-law wrongful death claim against Movants in Count Seven is premised on two potential theories of liability: (1) Movants may be held vicariously liable for the negligent, grossly negligent, willful, and/or intentional conduct of the MCSO officers who allegedly caused Akeem's death (Doc. 80 ¶¶ 218-20); and/or (2) Movants may be held liable for their own negligence in failing to adequately "train and supervise" those MCSO officers on the appropriate use of force, positional asphyxia, and interactions with non-violent, mentally disturbed individuals (*id.* ¶¶ 222-26).

### A.   **Vicarious Liability**

#### 1.   The County

The decision in *Fridena v. Maricopa County*, 504 P.2d 58 (Ariz. Ct. App. 1972), provides the starting point when assessing whether the County may be held vicariously liable under state law for torts committed by the Sheriff or MCSO personnel.  In *Fridena*, "deputy sheriffs of Maricopa County physically removed plaintiff Fridena from the hospital premises and caused her arrest for obstructing justice during the process of removing her." *Id.* at 60.  Fridena, in turn, sued Maricopa County under the theory that the writ of restitution on which the deputies relied when arresting her was invalid, that those deputies had been "negligent . . . by failing to ascertain the legality of the writ," and that the County could be held liable for the deputies' negligent acts because they were "acting as agents of the County." *Id.* at 60-61.  The trial court granted summary judgment in favor of the County and the Arizona Court of Appeals affirmed. *Id.* at 61-62.  As an initial matter,

the court explained that although "there are numerous actions brought each year in this state against the Sheriff, his deputies, and the various counties," "[t]he State Supreme Court has never been called upon to determine whether a county is automatically liable for every tort committed by its deputies." *Id.* at 61. Turning to that question, the court held that although the County generally "exercises supervision of the official conduct of the Sheriff," the County had not done so "in the instant case" because "the County, having no right of control over the Sheriff or his deputies in service of the writ of restitution, is not liable under the doctrine of Respondeat superior for the Sheriff's torts." *Id.* The court also cited, with approval, an earlier decision "wherein the Court of Appeals found no tort liability as to Maricopa County in the operation of a jail with the City of Tolleson for the reason that the County had no right to control." *Id.* at 62 (citing *Moore v. Maricopa County*, 466 P.2d 56 (Ariz. Ct. App. 1970)).

*Fridena* compels the conclusion that the County cannot be held vicariously liable under state law for any torts committed in this case by the Sheriff or individual MCSO personnel. In Arizona, the responsibility of operating jails and caring for inmates is placed by statute upon the Sheriff. *See* A.R.S. §§ 11-441(A)(5), 31-101. Thus, the County has "no right of control over the Sheriff or his deputies" in relation to the operation of jails and the caring of inmates. *Fridena*, 504 P.2d at 61. Absent such control, state-law vicarious liability is unavailable. *Id.*

Plaintiffs' arguments to the contrary are unavailing. In Plaintiffs' view, *Fridena* simply holds that the County may not be held vicariously liable for torts committed by MCSO personnel in one very specific context—the execution of writs of restitution—and that "[o]utside the context of the service of writs of restitution, *Fridena* has no application." (Doc. 112 at 13.) Plaintiffs are mistaken. *Fridena* holds that the County cannot be held vicariously liable under state law for the alleged torts of the Sheriff or his deputies in carrying out the Sheriff's statutory duties due to the County's lack of control over the execution of such duties. 504 P.2d at 61. Although the specific statutory duty at issue in *Fridena* was the execution of writs of restitution, the principle announced in *Fridena* is

more durable and far-ranging.  *See, e.g., Loredo v, Maricopa Cty.*, 2023 WL 2181126, *1-3 (Ariz. Ct. App. 2023) (citing *Fridena* and concluding that "Maricopa County is not vicariously liable for the negligent conduct of the Maricopa County Sheriff's employees because the county does not control or supervise these employees in any sense sufficient to give rise to a principal-agent relationship between them"); *Nevels v. Maricopa Cty.,* 2012 WL 1623217, *4 (D. Ariz. 2012) (citing *Fridena* for the proposition that "[b]ecause the duty to operate the jails has been statutorily delegated to the Sheriff and the County has no right to control operation of the jails, the County cannot be held vicariously liable for the torts of Sheriff's Deputies or Detention Officers").

Consider *Flanders v. Maricopa County*, 54 P.3d 837 (Ariz. Ct App. 2002), does not compel a different conclusion.  *Flanders* only analyzed whether the County could be held liable for a *Monell*-based § 1983 claim and did not analyze whether the County could also be held vicariously liable pursuant to a state-law tort claim.  *Id.* at 848 ("Our resolution of the issues means that Flanders will have judgment on the § 1983 claim for the full amount of compensatory damages against the County and the Sheriff.  His full recovery against all defendants on one cause of action renders it unnecessary to reach any other issue relating to Flanders' gross negligence claim . . . .").  Likewise, although Plaintiffs cite *United States v. Cty. of Maricopa, Az.*, 889 F.3d 648 (9th Cir. 2018), in support of their claim that "[i]t is the law in Arizona that the County is vicariously liable for the actions of the Sheriff and the Sheriff's employees in the County's jail" (Doc. 112 at 12-13), that case only involved federal claims brought against the County.  *Id.* at 649 (noting that the only claims were the United States' claims under Title VI and 34 U.S.C. § 12601).  It thus sheds no light on the circumstances under which an Arizona county may be held vicariously liable, for purposes of a state-law tort claim, for the conduct of county personnel.  That question, instead, is addressed in *Fridena*, which supports Movants' position that the County cannot be sued under a vicarious liability theory here.

… 

…

2.      Sheriff Penzone

The SAC also alleges that Sheriff Penzone may be held liable in Count Seven under a theory of vicarious liability.  (Doc. 80 ¶ 218 ["Defendant[] . . . Sheriff Penzone . . . [is] vicariously liable for the acts of the Officer Defendants."].)  Movants, in turn, do not argue that *Fridena* bars Plaintiffs' claim against Sheriff Penzone in Count Seven.  (Doc. 92 at 19-21.)  Instead, Movants' position seems to be that Count Seven should be dismissed as to Sheriff Penzone simply because the factual allegations in the SAC regarding his alleged training and supervision failures are too conclusory.  (*Id.*)  Plaintiffs' discussion of Count Seven, in turn, focuses almost exclusively on their (mistaken) arguments regarding *Fridena* and *Flanders* that are discussed above.  (Doc. 112 at 12-14.)  In reply, Movants accuse Plaintiffs of failing to "respond to [their] arguments" regarding Sheriff Penzone and argue that dismissal is warranted on that basis.  (Doc. 121 at 12-13.)[7]

Given this backdrop, the Court will simply address, in Part IV.B.2 below, the sufficiency of Plaintiffs' negligent training and supervision claims as applied to Sheriff Penzone.

B.      **Negligent Training And Supervision**

1.      The County

As discussed, Plaintiffs focus on *Fridena* and *Flanders* when addressing the County's potential liability in Count Seven and do not develop any argument as to why the County should be held responsible for its own supervision and training failures.  Nor would such an outcome make sense, given that, as discussed in Part IV.A.1 above, the Sheriff has the statutory responsibility for operating jails and caring for inmates and the County has

---

[7]      Movants also include the following heading in the section of their reply brief explaining why the County should be dismissed as a defendant in Count Seven: "The Sheriff's Office is the only proper defendant in the state-law claims."  (Doc. 121 at 11.)  The Court assumes this verbiage was intended to indicate that Sheriff Penzone is the only potential county representative who might be subject to state-law liability under a vicarious liability theory or negligent hiring/training theory and not a suggestion that the MCSO itself should have been named as the defendant in Count Seven.  *See, e.g., Braillard v. Maricopa Cty.*, 232 P.3d 1263, 1269 (Ariz. Ct. App. 2010) ("MCSO is a nonjural entity and should be dismissed from this case."); *Melendres v. Arpaio*, 784 F.3d 1254, 1260 (9th Cir. 2015) ("After *Braillard*, it is now clear that MCSO has improperly been named as a party in this action.").

1   "no right of control over the Sheriff or his deputies" in relation to those functions. *Fridena*,

2   504 P.2d at 61.  Thus, the County is dismissed as a defendant in Count Seven.

3                        2.   Sheriff Penzone

4         As noted, Plaintiffs allege that Sheriff Penzone is liable for failing to adequately

5   train and supervise MCSO officers regarding the proper use of force, interactions with

6   mentally disturbed individuals, and the dangers of positional asphyxia.  (Doc. 80 ¶¶ 222-

7   26.)  Although Movants question the adequacy of these allegations, which they characterize

8   as "conclusory" (Doc. 92 at 21; Doc. 121 at 12-13), the Court respectfully disagrees and

9   concludes that, at a minimum, Plaintiffs have adequately alleged that Sheriff Penzone

10  "failed to properly train and supervise their deputies regarding the dangers of positional

11  asphyxia and the danger signs of positional asphyxia."  (Doc. 80 ¶¶ 134, 140.)

12        This conclusion is not inconsistent with the *Monell* analysis set forth in Part III.C.1

13  above.  As noted, a pattern of prior similar incidents is ordinarily required to establish the

14  sort of deliberate indifference necessary to support a *Monell* claim.  But such a pattern is

15  not required to support a state-law negligent training claim.  To prevail on such a claim, a

16  plaintiff need only demonstrate "that a defendant's training or lack thereof was negligent

17  and that such negligent training was the proximate cause of the plaintiff's injuries."

18  *Ferreira v. Arpaio*, 2017 WL 6554674, *4 (D. Ariz. 2017) (citation omitted).  Taking as

19  true that the policies in effect for MCSO officers at the time of Akeem's death failed to

20  instruct officers on the dangers of positional asphyxia, this is sufficient to infer that those

21  policies were negligent.  Plaintiffs' allegations regarding the circumstances of Akeem's

22  death are also sufficient to suggest that this negligence proximately caused Akeem's

23  injuries and death.  Plaintiffs have therefore adequately stated a negligent training claim

24  against Sheriff Penzone.  This conclusion makes it unnecessary to evaluate, at least at this

25  juncture of the case, the sufficiency of Plaintiffs' other negligence-based allegations

26  against Sheriff Penzone.

27        …

28        …

1    V.    Leave to Amend

2        Plaintiffs request leave to amend in the event of dismissal because they have
3    "learned new information that supports their claims against the County and Sheriff
4    Penzone." (Doc. 112 at 14.)  Movants oppose this request, in part because some of the
5    purportedly new information "was available long before the [SAC] was filed" and more
6    broadly because Plaintiffs have already amended several times and "should not be given a
7    fourth bite at the apple." (Doc. 121 at 13.)

8        Plaintiffs' amendment request is governed by Rule 15(a) of the Federal Rules of
9    Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when
10   justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th
11   Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.*  Thus, Plaintiffs'
12   amendment request should be granted unless "the amendment: (1) prejudices the opposing
13   party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."
14   *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).
15   Additionally, "[t]he district court's discretion to deny leave to amend is particularly broad
16   where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil.*
17   *Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

18       To show they can allege additional facts to support their *Monell* claim against
19   Movants, Plaintiffs cite a reporter's interview with Sheriff Penzone about Akeem's death
20   in which Sheriff Penzone stated that "there are things that we should have done, that we
21   could have done" and that Akeem's death was "a tragedy that needs to be vetted out and
22   cleared up and never happen again . . . whatever that means." (Doc. 112 at 2.)  Plaintiffs
23   also refer to the allegation in the SAC that, two years after Akeem's death, Movants had
24   not completed any internal affairs or professional standards investigations and had not
25   disciplined, terminated, or retrained any of the MCSO officers responsible, which they
26   argue is "strong evidence" that the MCSO officers' actions toward Akeem amounted to
27   "standard operating procedures" for purposes of showing a pattern or practice of similar
28   violations.  (*Id.* at 9.)  To bolster this claim, Plaintiffs say they now have access to an

interview with MCSO Perez in which Perez said he had been involved in three prior instances in which "I had my guys do CPR on somebody that actually died" but he "never got interviewed about anybody," which Plaintiffs argue further suggests that Movants had a pattern and practice of ignoring constitutional violations.  (*Id.* at 14.)  Last, Plaintiffs argue that they have learned of additional interviews with MCSO employees who witnessed Akeem's death and the MCSO officers' failure to call for medical help, which Plaintiffs argue shows "a system-wide problem at the Jail where medical needs are routinely ignored."  (*Id.* at 15.)  Plaintiffs argue that these facts also raise the possibility of additional information in Movants' possession that can, via discovery, further support for their claims.  (*Id.*)

On the one hand, the Court is not necessarily persuaded that adding new factual allegations based on the additional materials identified by Plaintiffs would cure the deficiencies identified in earlier parts of this order.  Nor should Plaintiffs be given leave to amend simply because future discovery might allow them to discover facts that would enable them to plead a valid claim.  *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Appellant argues that the district court should not have dismissed its claims without permitting discovery.  It seeks permission to conduct discovery prior to the filing of any amendment which might be authorized by this Court. As Gallo points out, Rutman's position is unsupported and defies common sense.  The purpose of [Rule] 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery. . . .  [I]f the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility.") (citations and internal quotation marks omitted).

On the other hand, Movants do not argue that Plaintiffs' leave request is rooted in bad faith, that they will be prejudiced if Plaintiffs are given leave to amend, or that amendment will cause undue delay.  The Court also notes that, although Plaintiffs have already amended their complaint several times, this order marks the first time the Court

has been required to rule on a motion to dismiss.  Because leave to amend should be freely given, and this is the first time the Court has evaluated the sufficiency of Plaintiffs' claims against Movants, the Court will, in its discretion, grant Plaintiffs leave to amend.

However, the scope of this leave is circumscribed.  To the extent Plaintiffs wish to make another attempt to assert the *Monell* claim in Count Six of the SAC that has now been dismissed, it may not be directed against Sheriff Penzone in his official capacity (because any such claim would be duplicative of a *Monell* claim against the County). Additionally, Plaintiffs may not attempt to reassert their claim in Count Seven against the County because it is being dismissed for legal reasons (as opposed to insufficient factual allegations that could potentially be cured through the assertion of additional facts).

**IT IS ORDERED:**

1.     The reference to the Magistrate Judge is **withdrawn** as to Movants' motion to dismiss (Doc. 92), and the Motion is **granted in part and denied in part**.  Count Six is dismissed and Count Seven is dismissed as to Maricopa County.

2.     Plaintiffs may file a Third Amended Complaint within **21 days** of the issuance of this order.  If Plaintiffs file a Third Amended Complaint, the changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiffs shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

Dated this 15th day of November, 2023.

Dominic W. Lanza
United States District Judge