1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    Diamond Warren, et al.,                     No. CV-22-02200-PHX-DWL (CDB)

10                        Plaintiffs,

11   v.                                           **ORDER**

12   Paul Penzone, et al.,

13                        Defendants.

14

15          In this civil rights action, Plaintiffs Diamond Warren and Robert Yates, the

16   surviving parents of Akeem Terrell ("Akeem"), allege that various members of the Phoenix

17   Police Department ("PPD") and the Maricopa County Sheriff's Office ("MCSO")

18   (collectively, "the Defendant Officers") used excessive force on Akeem and ignored

19   Akeem's serious medical needs, resulting in Akeem's unnecessary pain, suffering, and

20   death.  (Doc. 155.)

21          In an earlier iteration of their complaint, Plaintiffs also sought to assert a *Monell*

22   claim against Maricopa County ("the County") under 42 U.S.C. § 1983 based on the

23   County's allegedly unconstitutional policies, customs, and supervisory and training

24   failures.  (Doc. 80 ¶¶ 210-15.)  However, in a November 15, 2023 order, the Court

25   dismissed the *Monell* claim for failure to state a claim.  (Doc. 148 at 12-20.)  The Court

26   also granted leave to amend as to the *Monell* claim.  (*Id.* at 25-27.)

27          Plaintiffs took advantage of that opportunity.  In Count Six of their Third Amended

28   Complaint ("TAC"), filed on December 6, 2023, Plaintiffs reassert a *Monell* claim against

1    the County and add various new factual allegations in support of that claim. (Doc. 155.)

2    The County has, in turn, again moved to dismiss under Rule 12(b)(6). (Doc. 164.) The

3    motion is now fully briefed. (Docs. 169, 176.) For the following reasons, the motion is

4    granted and the *Monell* claim is dismissed without leave to amend.

5    **DISCUSSION**

6    I.    <u>Legal Standard</u>

7    "[T]o survive a motion to dismiss [under Rule 12(b)(6)], a party must allege

8    'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

9    face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting

10    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the

11    plaintiff pleads factual content that allows the court to draw the reasonable inference that

12    the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

13    "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and

14    are construed in the light most favorable to the non-moving party." *Id.* at 1444−45 (citation

15    omitted). However, the Court need not accept legal conclusions couched as factual

16    allegations. *Iqbal*, 556 U.S. at 679-680. Moreover, "[t]hreadbare recitals of the elements

17    of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 679.

18    The Court also may dismiss due to "a lack of a cognizable theory." *Mollett v. Netflix, Inc*.,

19    795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

20    II.    <u>Summary Of November 15, 2023 Dismissal Order</u>

21    In the November 15, 2023 order, the Court provided a lengthy description of the

22    relevant factual allegations in the Second Amended Complaint ("SAC") before

23    summarizing that "Plaintiffs' allegations of deliberately indifferent policies, customs, and

24    supervisory and training failures can be construed as falling into five categories: (1) prone

25    positioning and positional asphyxia; (2) interaction with mentally or emotionally disturbed

26    citizens; (3) use of pre-isolation cells; (4) provision of medical care; and (5) internal

27    investigations of death-in-custody incidents." (Doc. 148 at 12, citations omitted.)

28    As for the first category (prone positioning and positional asphyxia), the Court

concluded that the SAC's allegations were insufficient to support *Monell* liability because "even accepting that [the County] failed to provide proper training on positional asphyxia, Plaintiffs must also allege facts showing that the need for more or different training in this area was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [the County] can reasonably be said to have been deliberately indifferent to the need." (*Id.* at 12-13, cleaned up.)  The Court noted that "the SAC only identifies three prior incidents that purportedly provided notice of the deficiency of [the County's] training and policies" yet "the SAC does not allege that any of those incidents involved positional asphyxia." (*Id.*)  This omission was significant for *Monell* purposes, the Court concluded, because "a pattern of similar constitutional violations by untrained employees is ordinarily necessary to make the required showing of deliberate indifference in relation to an alleged training failure." (*Id.* at 13-14, cleaned up.)

As for the second category (interaction with mentally/emotionally disturbed citizens), the Court explained that "the only specific shortcoming regarding mentally or emotionally disturbed citizens . . . is [the County's] alleged widespread custom and practice of designating mentally ill arrestees who are acting bizarrely as combative.  However, as with Plaintiffs' allegations regarding positional asphyxia, the problem is that there are no *facts* alleged in the SAC that might support this conclusion.  Again, the SAC identifies only three prior incidents involving other arrestees and does not allege (and Plaintiffs do not otherwise argue or present evidence) that any of those incidents involved MCSO personnel improperly characterizing as 'combative' an arrestee who was simply mentally ill." (*Id.* at 14-15.)

As for the third category (use of pre-isolation cells), the Court held that "[e]ven accepting that MCSO officers are improperly trained to believe the 'fiction' that individuals confined in the MCSO's pre-isolation cells are not in the County's 'care, custody, or control,' Plaintiffs have not alleged any other instances of constitutional violations that occurred in pre-isolation cells or any other facts from which to infer a 'widespread custom or practice' of MCSO officers violating the constitutional rights of

1   individuals placed in such cells.  There is no allegation that any of the three prior incidents

2   referenced in the SAC involved pre-isolation cells."  (*Id.* at 15.)

3          As for the fourth category (provision of medical care), the Court held that although

4   "the sufficiency of these allegations presents a somewhat closer call than the sufficiency

5   of the allegations supporting Plaintiffs' other *Monell* theories," in part because two of the

6   incidents alleged in the SAC ("the Figgins incident in 2016" and "the Ortiz incident in

7   2020") were alleged to involve failures to provide medical care, the allegations remained

8   deficient because the additional, judicially-noticeable facts provided by the County

9   established that "these incidents are too different from this case to form a pattern or practice

10  or put [the County] on notice.  Even if categorized far too generously as *Figgins* being

11  about a similar medical issue and *Ortiz* about an abandonment issue, they still represent

12  only an individual case about each of these issues which is insufficient to support a *Monell*

13  claim.  Even if these cases and *Atencio* were similar enough to put [the County] on notice

14  of something—and they are not—three incidents over a nine-year period, each about four

15  years apart, does not show a pattern or practice and cannot put a defendant on notice about

16  a continuing problem."  (*Id.* at 15-18, citations omitted.)

17         Finally, as for the fifth category (internal investigations of death-in-custody

18  incidents), the Court explained that "Plaintiffs do not identify any case holding (or even

19  suggesting) that a failure to complete a timely internal investigation into an incident

20  provides a pathway for holding a local government entity responsible for that incident

21  under *Monell*.  Nor would such a rule make sense, given that contemporaneous or

22  subsequent conduct cannot establish a pattern of violations that would provide notice to

23  the city and the opportunity to conform to constitutional dictates."  (*Id.* at 18-19, citation

24  omitted.)  The Court also held that the results of the internal investigation into Akeem's

25  death (*i.e.*, no discipline) "would not amount to ratification for *Monell* purposes even if

26  they were [pleaded]."  (*Id.* at 19.)

27         …

28         …

III.   New Factual Allegations In The TAC

The TAC includes the following additional allegations offered in support of the *Monell* claim:

¶ 147.  Despite having custody and control over people in pre-isolation cells, Maricopa County and the Sheriff established an official policy that they and their employees had no duty to monitor, protect, or care for inmates held in pre-isolation cells. According to Defendant Isaac Perez, this policy was a "mandate."

¶ 148.  According to Defendant Isaac Perez, Maricopa County and the Sheriff expressly trained employees that they were not responsible for the care, custody, and control of people held in pre-isolation cells.

¶ 149.  The Sheriff and the County receive notifications of all deaths and other serious medical events in the jail.

¶ 150.  Based on those notifications, the Sheriff and the County knew that detainees held in the pre-isolation cells would suffer from serious medical, intoxication, and mental health issues that would put them at risk of death or serious bodily injury.

¶ 151.  The Sheriff and the County knew that detainees at intake were likely to experience serious medical, intoxication, and mental health issues because, according to Isaac Perez, there were at least three deaths in jail intake prior to the death of Akeem Terrell that involved Defendant Perez.

¶ 152.  According to Defendant Perez, investigators never interviewed him or those he supervised about the three prior deaths.

¶ 153.  Defendant Perez believed that one of the prior deaths at intake was a drug overdose but did not know the cause of the other two or whether they involved uses of force.

¶ 154.  At his deposition, Defendant Perez was not able to give any identifying details about the times or circumstances of the three deaths in intake at the Maricopa County Jail that preceeded [sic] the death of Akeem Terrell.

¶ 155.  As a result of these prior deaths, the Sheriff and the County knew or should have known that adopting a policy or mandate that Sheriff and County personnel had no obligations to detainees in pre-isolation cells was a conscious decision to ignore serious dangers to detainees in those cells.

¶ 156.  As a result of the official mandate that Sheriff and County personnel were not responsible for the care and custody of those in pre-isolation cells, Defendants Perez and Moses left Akeem handcuffed and face down in the

pre-isolation cell without medical treatment even though, according to Defendant Perez, he was showing no signs of life.

¶ 157.   Maricopa County and the Sheriff also failed to create policies governing the use of force and the provision of medical care and mental healthcare to individuals in their pre-isolation cells as a result of Maricopa County and the Sheriff's adoption of the fiction that people held in their pre-isolation cells were not under their care, custody, and control.

(Doc. 155; *see also* Doc. 154 at 21-22 [indicating changes in redline].)

IV.   The Parties' Arguments

The County argues that the TAC's new factual allegations do not cure the deficiencies identified in the earlier dismissal order.  (Doc. 164.)  Regarding the three previously identified deaths, the County argues that Plaintiffs, once again, fail to provide any factual details to show a link between those deaths and the five categories of challenged conduct underlying the *Monell* claim.  (*Id.* at 5.)  As for the three deaths in intake that Plaintiffs now allege were known to Defendant Perez, the County argues that one of those deaths—from a drug overdose—is unrelated to any of the above categories and that even if the other deaths involved excessive force, *Monell* liability cannot be predicated on isolated or sporadic incidents.  (*Id.* at 5-6.)  The County also disputes that its policy of taking custody and control of arrestees only after they have been booked into the jail is unconstitutional.  (*Id.* at 6.)  The County argues that Plaintiffs' characterization of this policy as "an official policy that [the Sheriff and the County] and their employees had no duty to monitor, protect, or care for inmates held in pre-isolation cells" (Doc. 155 ¶ 148) is disingenuous because the County does not have a policy of leaving detainees in pre-isolation cells unattended and unprotected; rather, the arresting agency—in this case, the City of Phoenix—remains responsible for the detainee at all times prior to booking.  (Doc. 164 at 6-7.)  In support of this argument, the County relies, in part, on Defendant Perez's testimony during his November 2023 deposition, which Plaintiffs reference in the TAC.  (Doc. 155 ¶¶ 148, 152-54.)  During his deposition, Perez answered in the affirmative that, although the County, not the arresting agency, has keys to the pre-isolation ("iso") cells at the Jail and can monitor video feeds from these cells, the arresting agency is responsible

for its arrestees placed therein before booking.  (Doc. 164-1 at 4.)  Perez characterized these cells as "a detaining place" and said arrestees placed in them "do not belong to [the County], so at any point the [arresting] agency could just cite and release them . . . without us being involved.  Medical staff could go in the cell.  The agencies could go in the cell." (*Id.* at 5.)  According to Perez, MCSO staff "assist agencies if they're short-staffed or depending on the situation.  MCSO is always in the building and so we will respond in whatever manner that we can to assist that agency."  (*Id.* at 8.)  Perez further explained that, if there is a problem with an iso detainee, "we would say the name of the inmate and what agency they belong to and usually that agency gets up and deals with the particular inmate, on a one-on-one basis, if they can."  (*Id.*)  At any rate, in addition to claiming there is nothing unconstitutional about its policy, the County argues that Plaintiffs do not allege any facts from which to infer that this policy was the moving force behind Akeem's death. (Doc. 164 at 7-8.)  The County further argues that, even if there were a causal connection, Plaintiffs do not allege any facts from which to infer the County was on notice of any potential constitutional violations from the policy, as required to show that adopting this policy "reflects deliberate indifference to the constitutional rights of [the County's] inhabitants."  (*Id.* at 8, citation omitted.)

In response, Plaintiffs broadly argue that the TAC's allegations regarding the County's alleged failures in training jail employees on submission techniques, in interacting with mentally ill detainees, and in monitoring detainees for serious medical needs are sufficient to state a *Monell* claim.  (Doc. 169 at 9.)  Plaintiffs contend that the additional allegations in the TAC that (1) the County receives notice of all deaths and other serious medical events in the jail, and (2) Defendant Perez was aware of three prior deaths during intake, together show that the County "knew that individuals held in pre-isolation cells during the intake process would inevitably suffer from serious medical or mental health issues that would put them at risk of death or serious bodily injury."  (*Id.*)  Plaintiffs argue that these three deaths, whether due to drug overdoses or other causes, are enough to show a clear pattern of medical issues arising during the pre-booking intake process, which

1   in turn would have placed the County on notice that constitutional violations were likely

2   to result if jail employees "did not receive proper training on their obligation to provide

3   access to medical care." (*Id.* at 10.)  The remainder of Plaintiffs' arguments center around

4   the County's alleged policy that its officers and jail employees are not responsible for the

5   care, custody, and control of pre-booking detainees.  Plaintiffs again rely on the three prior

6   alleged deaths in intake to show that the County was on notice "that detainees confined in

7   pre-isolation cells would inevitably experience medical issues for which they would be

8   denied care." (*Id.* at 8.)  Plaintiffs also argue that the TAC alleges sufficient facts to

9   demonstrate that the County's policy or "mandate" was the moving force behind Akeem's

10   death, because after Akeem became unresponsive and was "showing no signs of life,"

11   MCSO employees Perez and Moses left Akeem handcuffed and face down in the pre-

12   isolation cell without rendering assistance or obtaining medical treatment.  (*Id.* at 10.)

13   Plaintiffs argue that, by ignoring Akeem's obvious medical distress and failing to render

14   aid, these officers acted consistently with the County's policy that they were not

15   responsible for Akeem's care in this situation. (*Id.*)

16   V.    <u>Analysis</u>

17          A.    **Failure to Train**

18          To the extent Plaintiffs' *Monell* claim is premised on a failure-to-train theory, the

19   additional allegations in the TAC fail to remedy the deficiencies identified in the earlier

20   dismissal order.

21          First, Plaintiffs do not allege any additional facts about the in-custody deaths of

22   detainees Atencio, Figgins, or Ortiz to show they were caused by positional asphyxia or

23   the failure of jail employees to interact properly with mentally ill individuals.  Thus, for

24   the reasons discussed in the earlier dismissal order, these allegations once again fail to

25   show that "the need for more or different training" in these areas was "so obvious, and the

26   inadequacy so likely to result in the violation of constitutional rights," that the County "can

27   reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio

28   v. Harris*, 489 U.S. 378, 390 (1989).

1         The TAC's additional allegations that Defendant Perez was aware of three prior

2 detainee deaths during intake, one of which resulted from a drug overdose, do not change

3 the analysis.  This is because the TAC fails to allege any facts connecting these deaths to

4 positional asphyxia or the improper treatment of mentally ill detainees.  Plaintiffs appear

5 to concede as much when they only argue that these deaths are sufficient to show that "the

6 County was on notice that medical issues were likely to arise during [intake] and that

7 constitutional violations would likely result if the jail's employees did not receive proper

8 training on their obligation to provide access to medical care." (Doc. 169 at 10.)  Plaintiffs

9 do not argue that these three deaths would have put the County on notice of the need for

10 more or different training on positional asphyxia and interacting with mentally ill arrestees,

11 nor can they satisfy this element of their *Monell* claim without alleging any facts from

12 which to infer a pattern of prior constitutional violations related to improper compliance

13 techniques and interactions with mentally ill detainees.  *Connick v. Thompson*, 563 U.S.

14 51, 62 (2011) ("Without notice that a course of training is deficient in a particular respect,

15 decisionmakers can hardly be said to have deliberately chosen a training program that will

16 cause violations of constitutional rights.").

17         The TAC's additional allegations are also too speculative and conclusory to support

18 a *Monell* claim based on the County's alleged failure to train jail employees on the

19 provision of medical care.  Where municipal liability is based on an alleged failure to train,

20 a plaintiff must allege that the municipality exhibited "'deliberate indifference to the rights

21 of persons' with whom [the entities'] employees are likely to come into contact."  *Lee v.*

22 *City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001).  True, the TAC's allegation that

23 the County receives notifications of all deaths and other serious medical events in the jail

24 supports an inference that the County was aware of the three alleged prior deaths of

25 detainees during intake.  Additionally, Defendant Perez's testimony that he was involved

26 in these incidents, and the allegations regarding Akeem's arrest and detention, together

27 permit the reasonable inference that jail employees have regular contact with arrestees

28 during intake, including individuals who are experiencing or may at some point during

intake experience serious medical needs.  However, beyond alleging that all three deaths occurred during intake, the TAC does not allege any *facts* regarding the circumstances of these deaths to show they resulted from jail employees' failures to render or summon proper medical care.  Thus, there is no basis from which to infer that the County had notice of a particular deficiency in its training in this area.  Moreover, for liability to attach, the alleged deficiency in the training program must be "closely related to the ultimate injury," *City of Canton*, 489 U.S. at 391—in this case, Akeem's death due to positional asphyxia.  Simply alleging facts showing the County was aware of the need to provide proper training to jail employees on responding to medical needs, and then alleging in conclusory terms that the County failed to provide such training, is too conclusory to make the required showing.  *A.E. ex rel. Hernandez v. City of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) ("[A]llegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.  This standard applies to *Monell* claims . . . .") (citations omitted);

### B.  **Pre-Isolation Cells**

The new allegations in the TAC are sufficient to infer that the County had an official policy—what Perez described as a "mandate"—that arrestees who are brought to the jail and placed in pre-isolation cells remain in the care, custody, and control of the arresting agency, not the County.

Because Plaintiffs have now alleged the existence of a formal policy, the analysis is somewhat different than the analysis that governs Plaintiffs' various failure-to-train theories.  "A *Monell* claim predicated upon a formal policy differs from one premised upon a practice or custom in" various respects, including that "a single constitutional violation undertaken pursuant to a formal policy may be sufficient to establish municipal Section 1983 liability."  *Est. of Kong by & through Kong v. City of San Diego*, 2023 WL 4939370,

*5 (S.D. Cal. 2023).  In such instances, "the municipal policy need only cause a constitutional violation; it need not be unconstitutional per se." *Jackson v. Gates*, 975 F.2d 648, 654 (9th Cir. 1992).  In other words, if "implementation of the policy resulted in a constitutional tort," the municipality is liable, "whether or not [it] intended the result or had full knowledge of the possible consequences of [its] actions." *Id.*  A policy causes the injury where it is "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694.

The TAC alleges that "[a]s a result of the official mandate that . . . County personnel were not responsible for the care and custody of those in pre-isolation cells, Defendants Perez and Moses left Akeem handcuffed and face down in the pre-isolation cell without medical treatment, even though, according to Defendant Perez, he was showing no signs of life." (Doc. 155 ¶ 156.)  In their response, Plaintiffs elaborate that these officers were "acting consistently with the County's policy when they denied aid and ignored Akeem's obvious distress." (Doc. 169 at 8.)

The TAC's new allegations are insufficient to state a *Monell* claim premised on an official policy.  First, although the TAC now alleges an express mandate of the County, it does so only at a high level of generality, making it implausible to infer a link between the County's policy governing which agency has care, custody, and control over pre-booking jail detainees and the alleged constitutional violation of leaving Akeem prone and unresponsive in a cell without medical care.  Where, as in *Monell*, the challenged policy directly compels the alleged constitutional violation, a plaintiff need only allege "a statement of the policy . . . and its exercise." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985).[1]  But where, as here, "the 'policy' that [the plaintiff] seeks to rely upon is far more nebulous, and a good deal further removed from the constitutional violation," "its causal relation to the alleged constitutional violation . . . [is] not susceptible to such easy

---

[1]     The issue in *Monell* was whether a city could be held liable under § 1983 for an equal protection claim stemming from its employment policy that "by its terms compelled pregnant employees to take mandatory leaves of absence before such leaves were required for medical reasons." *Tuttle*, 471 U.S. at 822.

proof." *Id.* at 822-23.

> Obviously, if one retreats far enough from a constitutional violation some
> municipal "policy" can be identified behind almost any such harm inflicted
> by a municipal official; for example, Rotramel would never have killed
> Tuttle if Oklahoma City did not have a "policy" of establishing a police force.
> But *Monell* must be taken to require proof of a city policy different in kind
> from this latter example before a claim can be sent to a jury on the theory
> that a particular violation was "caused" by the municipal "policy."  At the
> very least there must be an affirmative link between the policy and the
> particular constitutional violation alleged.

*Id.*  Here, the necessary affirmative link is still missing.

Second, even if the TAC had alleged sufficient facts from which to infer that the County's policy of holding the arresting agency, not the County, responsible for the care, custody, and control of pre-booking detainees affirmatively caused the MCSO Officer Defendants to deliberately disregard Akeem's serious medical needs, such that this policy was the "moving force" behind the alleged constitutional violation, *Monell*, 436 U.S. at 694, the TAC's allegations regarding the nature of the policy are contradicted in significant respects by MCSO Department Order DO-1, "Intake Process," which the County proffers for the Court's consideration.  (Doc. 176 at 5; Doc. 92-1 at 30-42.)

As an initial matter, the Court may consider DO-1 without converting the County's motion into a motion for summary judgment.  Because Plaintiffs reference the County's jail intake policy in the TAC when they refer to the County's "mandate" regarding the custody status of pre-booking detainees, the policy is incorporated by reference in the TAC. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may consider certain matters . . . [including] documents incorporated by reference in the complaint . . . without converting the motion to dismiss into a motion for summary judgment.").  *See also Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("We have extended the doctrine of incorporation by reference to consider documents in situations where the complaint necessarily relies upon a document or the contents of the document are alleged in a complaint, the document's authenticity is not in question and there are no disputed

issues as to the document's relevance.").   And when, as here, a document that is incorporated by reference in the complaint contradicts the factual allegations in the complaint, those factual allegations need not be accepted as true.  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("[W]e need not accept as true allegations contradicting documents that are referenced in the complaint . . . .").   Additionally or alternatively, administrative regulations are public records, with DO-1 being publicly available on the MCSO website, and the text of DO-1, which the County proffers, is not subject to reasonable dispute.  "A court considering a motion to dismiss may take notice of matters of public record, and materials necessarily relied upon in the pleadings where authenticity is not contested."  *Lee,* 250 F.3d at 669 (9th Cir. 2001); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1026 n.1 (9th Cir. 2009) ("We agree to take judicial notice of the Santa Monica ordinance.").

DO-1 "establish[es] guidelines and procedures for [Sheriff's] Office personnel who accept, book, and process prisoners into the Intake, Transfer, and Release (ITR) facility." (Doc. 92-1 at 30.)  The policy defines the "intake process" as "[p]rocedures for accepting prisoners into an Office jail facility."  (*Id.*)  A prisoner is further defined as "[a]n individual deprived of their liberty and kept under involuntary restraint, confinement, or custody prior to being accepted into an Office jail facility."  (*Id.* at 31.)  Before accepting a prisoner, jail staff must "[e]nsure [that] a Correctional Health Services (CHS) triage nurse visually checks each prisoner, inquiries into the status of their health, and completes a questionnaire in the TechCare program."  (*Id.* at 32.)  More relevant to Plaintiffs' claim, DO-1(C)(1) provides that "[d]etention personnel observing prisoners with an injury, illness, or extreme intoxication level from either alcohol or an unknown substance not previously reported, shall immediately notify the CHS triage nurse."  (*Id.*)  Given these features of the policy at issue, Plaintiffs have not alleged—and cannot plausibly allege—that the policy relieves MCSO officers of their duty to notify medical staff of any observed serious medical needs of pre-booking detainees.[2]

_____

[2]    Additionally, for the reasons already discussed regarding Plaintiffs failure-to-train theories of *Monell* liability, Plaintiffs fail to allege sufficient facts to show a custom or

VI.   Leave To Amend

Plaintiffs argue that, if the Court grants the motion to dismiss, they should be granted leave to amend based on new facts they may learn in discovery.  (Doc. 169 at 10.) Plaintiffs argue they "have continued their investigation and discovery . . . and continue to learn new information that supports their claims against the County."  (*Id.*)

The County opposes this request, arguing that under *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987), the prospect of future discovery is an insufficient basis to grant leave to amend a claim dismissed under Rule 12(b)(6).  (Doc. 176 at 6.)   The County also argues that Plaintiffs' discovery requests have already been answered, and all individual Defendants were deposed before Plaintiffs filed the TAC, so Plaintiffs have had ample opportunity to state a claim if one existed, making a fourth amendment of their pleading futile.  (*Id.*)   Finally, the County argues that because "the purpose of [Rule] 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery," *Rutman*, 829 F.2d at 738, the County would be prejudiced by being subjected to additional discovery and court proceedings while Plaintiffs try for a fourth time to state a claim.  (*Id.*)

Plaintiffs' amendment request is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is 'to be applied with extreme liberality.'"  *Id.*  Thus, Plaintiffs' amendment request should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

In their previous leave request, Plaintiffs identified specific materials they believed contained relevant additional facts and argued that, if given leave to allege these additional

---

regular practice of County officers ignoring the serious medical needs of pre-booking detainees.  Thus, to the extent Plaintiffs seek to hold the County liable based on an informal custom/regular practice or on its alleged failure to train (as opposed to based on an official policy), both of which require a pattern of similar constitutional violations, Plaintiffs also fail to state a *Monell* claim.

facts, they could cure any deficiencies in their *Monell* claim.  (Doc. 112 at 14-15.)  The Court expressed doubt at that time that "adding new factual allegations based on the additional materials identified by Plaintiffs would cure the deficiencies identified in earlier parts of this order."  (Doc. 148 at 26.)   The Court also cited *Rutman* for the proposition, now reiterated by the County, that leave to amend should not be granted "simply because future discovery might allow [Plaintiffs] to discover facts that would enable them to plead a valid claim."  (*Id.*)  Nevertheless, the Court concluded that, "[b]ecause leave to amend should be freely given, and this is the first time the Court has evaluated the sufficiency of Plaintiffs' claims against Movants, the Court will, in its discretion, grant Plaintiffs leave to amend."  (*Id.* at 27.)

The landscape has now changed.  In the previous dismissal order, Plaintiffs were given notice of the areas of deficiency in their *Monell* claim and an opportunity to amend, yet the *Monell* claim in the TAC continues to suffer from the same deficiencies.  Moreover, in their current request for leave to amend, Plaintiffs do not identify any specific new facts they believe they can allege in support of their *Monell* claim.  Instead, they appear to rely solely on the prospect of future discovery to reveal as-yet-undiscovered facts.  But "[t]he purpose of [Rule] 12(b)(6) is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery. . . .  [I]f the allegations of the complaint fail to establish the requisite elements of the cause of action, our requiring costly and time consuming discovery and trial work would represent an abdication of our judicial responsibility."  *Rutman*, 829 F.2d at 738 (citations and internal quotation marks omitted).

Additionally, because Plaintiffs have already received discovery and had an opportunity to depose all individual Defendants before filing the TAC, it appears that leave to amend would be futile.

For these reasons, Plaintiffs' *Monell* claim against the County in Count Six is dismissed without leave to amend.  *Ascon Props., Inc. v. Mobil Oil. Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (noting that "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint").

Accordingly,

**IT IS ORDERED** that:

1.      The reference to the Magistrate Judge is **withdrawn** as to the County's motion to dismiss (Doc. 164), and the motion is **granted**.

2.      Plaintiffs' *Monell* claim in Count Six of the TAC is **dismissed** pursuant to Rule 12(b)(6) for failure to state a claim.

3.      Defendant Maricopa County is **dismissed** from this action.

Dated this 17th day of May, 2024.

_____
Dominic W. Lanza
United States District Judge